# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MAUREEN E. BAKER** as Personal Representative of the Estate of Barnaby Dupuis Baker, | Case No. 3:24-cv-709-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **OREGON HEALTH AND SCIENCE UNIVERSITY** and **RODNEY F. POMMIER, M.D.**, | |
| Defendants. | |

Benjamin T.G. Nivision and C.N. Coby Cohen, Rossi Vucinovich pc, 1000 Second Avenue, Suite 1420, Seattle, Washington, 98104. Of Attorneys for Plaintiff.

Michael J. Wiswall and Taylor B. Lewis, Hart Wagner llp, 1000 SW Broadway, Twentieth Floor, Portland, OR 97205. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Maureen E. Baker, the surviving spouse of Barnaby D. Baker ("Mr. Baker") and the personal representative of his estate, originally sued Defendants Oregon Health & Science University ("OHSU"); Rodney F. Pommier, M.D.; Glenn I. Pearson, Certified Registered Nurse Anesthetist; and Katie J. Schenning, M.D. ECF 1 (Complaint). In her First Amended Complaint ("FAC"), Plaintiff alleges medical negligence and lack of informed consent. ECF 35. After filing

PAGE 1 – OPINION AND ORDER

her FAC, Plaintiff voluntarily dismissed all claims against Defendants Pearson and Schenning and all claims against all Defendants that alleged lack of informed consent. ECF 48. Now before the Court is Defendants' motion for summary judgment (ECF 38), and after Plaintiff's voluntarily dismissals, all that remains of Defendants' motion is Motion No. 2, which argues that Plaintiff cannot prove that Defendants' "alleged breach of the standard of care *caused* Mr. Baker's death." *Id.* at 10 (emphasis in original).[1] For the reasons explained below, the Court denies Defendant's summary judgment Motion No. 2.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509

---

[1] For purposes of Defendants' motion for summary judgment only, Defendants do not deny that they breached the applicable standard of care. ECF 50 at 2 n.1. Thus, only causation is at issue in Defendants' Motion No. 2.

F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving

party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that

there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and

draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters,

Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla

of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252,

255. "Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586

(2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

In the Spring of 2022, Mr. Baker experienced abdominal pain and an associated

abdominal bulge. Declaration of Taylor B. Lewis ("Lewis Decl."), Ex. 1 at 1-3 (ECF 39-1).

Mr. Baker sought medical treatment from Dr. Rodney Pommier, who had previously surgically

removed a neuroendocrine tumor from Mr. Baker in January 2020. *Id.* at 1. Mr. Baker underwent

a PET scan that revealed an abdominal hernia. *Id.* at 2. On April 4, 2022, Dr. Pommier held a

tele-health visit with Mr. Baker to discuss treatment options for Mr. Baker's hernia. *Id.*; Lewis

Decl., Ex. 2 at 196:5-19. Dr. Pommier discussed nontreatment, non-surgical interventions, and

surgical interventions, including the risks of each approach. *Id*. at 196:11-16. He informed

Mr. Baker that surgery carried a small risk of death and that nonsurgical treatment could result in

a bowel obstruction or bowel strangulation that might kill him or make him very sick. *Id.*

at 194:6-16, 196:11-16. Dr. Pommier also informed Mr. Baker that a surgeon closer to his home in Seattle could perform the surgery, but Mr. Baker expressed his desire for Dr. Pommier to operate. *Id*. at 78:16-79:23; Lewis Decl., Ex. 3 at 280:14-281:18.

The operation was scheduled for April 27, 2022. Lewis Decl., Ex. 9 at 1. The day before the scheduled surgery, Mr. Baker travelled alone from Seattle to Portland. Ex. 12 at 81:7-25. Before leaving Seattle, he expressed optimism to his son about the surgery, describing it as routine. Ex. 11 at 58:17-19; 60:5-8.

On the morning of the surgery, Mr. Baker went to the hospital and engaged in several preoperative activities, all designed to ensure that he understood the procedure's risks and that his medical providers understood their patient. Mr. Baker completed a medical history questionnaire, indicating that he had no known cardiac conditions. Ex. 13. Dr. Wyatt Rodan performed a preoperative consent discussion, and Mr. Baker signed a consent form. Ex. 6. Glenn Pearson and Dr. Katie Schenning, the nurse anesthetist and the anesthesiologist for Mr. Baker's surgery, respectively, performed a preoperative assessment, including a cardiac screening; they determined that Mr. Baker was a "low-risk patient for having a cardiac event." Ex. 4 at 106:16-17. During the surgery, however, Mr. Baker went into ventricular tachycardia, prompting a "Code Blue." Ex. 8 at 2-3. Despite the efforts of several health care providers, Mr. Baker died. *Id*. During the subsequent autopsy, a pathologist, Dr. Carl Wingren, discovered that Mr. Baker's heart weighed 563 grams, leading him to conclude that Mr. Baker's death was "due to cardiomegaly [an enlarged heart] with associated cardiac dysrhythmia complicating operative procedure." Ex. 9 at 1-3.

## DISCUSSION

Under Oregon law, to prevail on a medical negligence claim, a plaintiff must prove "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to

the plaintiff measurable in damages; and (4) causation, *i.e.,* a causal link between the breach of duty and the harm." *Zehr v. Haugen*, 318 Or. 647, 653-54 (1994) (citing *Stevens v. Bispham*, 316 Or. 221, 227 (1993)). In their Motion No. 2, Defendants argue only that Plaintiffs fail to prove causation. ECF 38 at 11-12. Thus, the fundamental question is whether the expert reports and depositions on file create a genuine question of material fact as to whether Defendants' failure to discover Mr. Baker's heart condition caused Plaintiff harm.

Defendants contend that there is no question of material fact for two reasons. First, they argue that Plaintiff will be unable to establish that Mr. Baker had cardiomegaly before surgery because Plaintiff's disclosed experts did not state such an opinion in their reports. *Id.* at 11. Defendants note that Dr. Schenning testified to the possibility that the cardiopulmonary resuscitation ("CPR") performed on Mr. Baker or the infusion of intravenous ("IV") fluids during the resuscitation efforts could have caused Mr. Baker's cardiomegaly. *Id.* Second, Defendants argue that Plaintiff cannot show that a preoperative cardiac evaluation would have revealed Mr. Baker's cardiomegaly, even if it did preexist the surgery. *Id.* Thus, Defendants assert that Plaintiff cannot show a "reasonable medical probability" that Defendants' negligence caused Plaintiff's injury, as required under Oregon law. *Id.*; *see also Joshi v. Providence Health Sys. of Or.*, 198 Or. App. 535, 544 (2005), *aff'd by* 342 Or. 152 (2006).

Plaintiff responds by citing to the deposition testimony of both her own experts, as well as Defendants' experts and Defendants themselves. *See* ECF 44 at 2-12. This testimony, she argues, includes opinions that Mr. Baker's cardiomegaly pre-dated his surgery and that a proper preoperative cardiac evaluation would have revealed it. *Id.* Specifically, in opposition to Defendants' Motion No. 2, Plaintiff offers the following evidence:

1.      The forensic pathologist who performed the autopsy, **Dr. Carl Wigren**, determined that a structural abnormality in the heart was the cause of Mr. Baker's premature intraoperative death. According to Dr. Wigren, "the death of this 69-year-old male . . . is due to cardiomegaly with associated cardiac dysrhythmia complicating operative procedure." ECF 45-4 at 4.

2.      Defendants' expert witnesses **Dr. Andrew Baker** and **Dr. BobbieJean Sweitzer** agree with Dr. Wigren. According to Dr. Baker, "[b]ased on all the available materials, the most likely explanation for Mr. Baker's death was a sudden and unexpected cardiac arrhythmia complicating his cardiomegaly." ECF 45-7 at 6. According to Dr. Sweitzer, "Mr. Baker died intraoperatively of an unexpected and sudden lethal arrhythmia due to his *underlying* cardiomegaly, as found on autopsy, and his age." ECF 31-6 at 2 (emphasis added).

3.      Plaintiff's expert witness **Dr. Ausamma Nassar** provided the following opinion:

a.      "In my professional judgment, a more thorough preoperative cardiac evaluation was required by the standard of care in this case, for this patient. That would have included a NT-proBNP, current ECG, and particularly transthoracic echocardiography." ECF 45-1 at 4.

b.      "Had that been done, it is more likely than not that significant cardiac dysfunction would have been identified." ECF 45-1 at 4.

c.      "It is my opinion, with reasonable medical certainty, that the failure to conduct a thorough and contemporary cardiac evaluation constituted a deviation from the standard of care under these circumstances, for this patient, at both the surgical team level and the institutional level." ECF 45-1 at 4.

        d.      "Such an evaluation likely would have prevented or significantly mitigated the risk of intraoperative cardiac complications and death." ECF 45-1 at 4.

        4.      Plaintiff's expert witness **Dr. Kiran K. Khush** provided the following opinion:

        a.      "In summary, it is my professional opinion, based on my education, training, and experience, that adequate pre-operative evaluation was not performed prior to Mr. Baker's surgery." ECF 45-2 at 8.

        b.      "If such testing had been performed, further evaluation and treatment of any identified abnormalities and risk factors likely would have prevented his demise." ECF 45-2 at 8.

        c.      "In this case, a more careful evaluation would have reasonably included [the following]:" ECF 45-2 at 6.

        i.      *Laboratory testing*: at the very least a metabolic panel, including electrolytes and renal function, would be appropriate given his age, gastrointestinal symptoms, and history of bowel obstruction. Electrolytes abnormalities (e.g. hypokalemia, hypomagnesemia) may predispose to arrhythmias, and acute kidney injury and/or chronic kidney disease may affect proper dosing of medications in the peri-operative period." ECF 45-2 at 6.

        ii.      "*Electrocardiogram*: a screening ECG to evaluate for signs of ischemia or conduction system disease would be appropriate in a 69-year-old male with obstructive sleep apnea who has not had an ECG performed in over 2 years. This is also relevant in a patient taking sertraline, which can cause QT interval prolongation, which can increase the risk for ventricular arrhythmias." ECF 45-2 at 6.

        iii.      "*Echocardiogram*: in a patient with no previous cardiac imaging, it would be reasonable to assess heart size and function, and to rule out structural abnormalities,

prior to undergoing abdominal surgery. This is particularly relevant to the patient at hand, given his history of carcinoid syndrome. . . . This would be easily evaluated with non-invasive testing such as echocardiography." ECF 45-2 at 6.

        d.     "If cardiac evaluation had been performed, and had abnormalities had been found (e.g. cardiomegaly, valvular disease), the patient's elective abdominal surgery would likely have been postponed. This would have allowed for additional testing and treatment to be performed. For example, if he were found to have cardiomegaly, or an enlarged heart, he would have had stress testing or repeat coronary imaging to evaluate for ischemia. He may have had more advanced imaging, such as a cardiac MRI, to evaluate the cause of his cardiomegaly. He would have been started on medical therapies for cardiomegaly (e.g. heart failure medications), to optimize his cardiac function. Consideration would have been given to having a cardiac anesthesiologist involved in his surgery. If valvular disease were found, he would have had further risk stratification and potential treatment of his valvular disease, based on its severity. All of these measures would have allowed for better cardiac risk stratification prior to surgery, and measures could have been taken to reduce his peri-operative risk of adverse events." ECF 45-2 at 6-7.

        e.     "[I]t is probable that patient-related factors contributed to his cardiac arrest, and these were not adequately evaluated in the pre-operative period." ECF 45-2 at 8.

     5.     Plaintiff's expert witness **Dr. Matthew Chan** provided the following opinion:

*"On a chest radiograph, often called a chest x-ray, an enlarged heart may be readily apparent* as the heart would occupy a larger proportion of the thoracic cavity. Upon encountering a large heart on chest radiography, the next step is to compare the size of the heart on a prior chest radiograph (chest x-ray from an older date) to ascertain the rate of cardiac enlargement

over time. If the heart has been enlarged on multiple prior exams, it is typically assumed that the

patient is already aware, a diagnosis has already been made, and the patient has been offered

treatment options. All of these can be confirmed via the patient's electronic medical record, via a

conversation with the patient, and/or a conversation with the referring physician." ECF 45-3 at 2

(emphasis added).

Notwithstanding this evidence, Defendants contend in their reply that Plaintiff has not

shown through expert testimony a genuine issue on "whether additional cardiac screening would

have revealed the cardiomegaly (diagnosed post-mortem), to a reasonable medical *probability*."

ECF 50 at 2 (emphasis in original). Specifically, Defendants argue:

> Plaintiff contends that Mr. Baker died from undiagnosed
> cardiomegaly resulting in cardiac arrythmia as a complication from
> surgery. (Doc. 44). She further claims that had the cardiomegaly
> been diagnosed before surgery, then surgery would have been
> postponed for additional cardiac testing. (Doc. 44). Given this, to
> create a question of fact, plaintiff had to proffer qualified expert
> testimony establishing that additional preoperative cardiac
> screening *probably*, not *possibly*, would have revealed the
> cardiomegaly. She failed to do so.

*Id.* at 2 (emphasis in original).

Regarding the expert opinion offered by Dr. Matthew Chan, Defendants note that

Dr. Chan opined that if a chest x-ray had been performed before surgery, "an enlarged heart may

be readily apparent." Focusing on the word "may," Defendants argue that "[s]aying that

cardiomegaly 'may be present' is the same as saying it is 'possible.'" ECF 50 at 3. Defendants

then conclude that a medical opinion saying that cardiomegaly before surgery is merely

"possible" is legally insufficient to create a genuine issue for trial in this case.

The Court rejects Defendants' premise that Dr. Chan asserted, in essence, that

cardiomegaly "may be present." That is not what Dr. Chan opined. He said that if a chest x-ray

had been performed before surgery, "an enlarged heart may be readily apparent." ECF 45-3 at 2.

Concededly, the word "may" in this context is potentially ambiguous. As Bryan Garner notes, however, the words "may" and "might" "occupy different places on a continuum of possibility. *May* expresses likelihood <we may go to the party>, while *might* expresses a stronger sense of doubt." Bryan A. Garner, GARNER'S MODERN ENGLISH USAGE 697 (5th ed. 2022) (may; might).

In addition, Dr. Chan did not say that cardiomegaly may be present. He said that after an x-ray, an enlarged heart "may be readily apparent." As Garner teaches, the second sense of "apparent" is "obvious" and "Sense 2 is usual after a be-verb." *Id.* at 74 (apparent). This further strengthens Dr. Chan's opinion beyond merely an expression of a mere possibility to that of a likely—indeed obvious—existence; namely, an enlarged heart would have been obvious, if one would have just looked. Viewing the facts in the light most favorable to Plaintiff as the non-moving party, this is a reasonable interpretation of Dr. Chan's opinion.[2]

Finally, as previously noted, Defendants' own expert Dr. Sweitzer opined that Mr. Baker died intraoperatively of an unexpected and sudden lethal arrhythmia "due to his *underlying* cardiomegaly, as found on autopsy, and his age." ECF 31-6 at 2 (emphasis added). Dr. Sweitzer's use of the word "underlying" implies that the cardiomegaly existed before Mr. Baker's death because Dr. Sweitzer said that the death was due to the underlying cardiomegaly and Mr. Baker's age. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2489 (2002) (noting the third definition of "underlie" is "to be at the basis of").[3]

---

[2] The precise meaning that Dr. Chan intended may be explored at trial. The parties, however, have not provided the Court with any contrary explanation previously offered by Dr. Chan at deposition.

[3] As with Dr. Chan's opinion, the precise meaning that Dr. Sweitzer intended may be explored at trial, and the parties have not provided the Court with any contrary explanation previously offered by Dr. Sweitzer at deposition.

Viewing the facts in the light most favorable to Plaintiff, as the Court must do at this stage of the litigation, the Court concludes that Plaintiff has shown a genuine question of material fact as to whether Defendants' allegedly negligent conduct caused Plaintiff's injury, and that is a question that must be decided by a jury.

## CONCLUSION

The Court DENIES Defendants' motion for summary judgment, ECF 38.

**IT IS SO ORDERED**.

DATED this 9th day of December, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge